**George P. Eastman, Plaintiff and Appellee, v. United Marble Companies, Defendant.**
**Daprato Statuary Company, Garnishee. Carl B. Hinsman, Executor of last will of John A. Mead, Deceased, Intervening Claimant and Appellant.**

### Gen. No. 26,738.

1. GARNISHMENT—*sufficiency of evidence.* In a suit in attachment, where a debtor of defendant was served as garnishee and appellant intervened as the executor of the will of one claiming the amount due under an assignment of the account of defendant against the garnishee, the claim being that testator and not the defendant was the real owner of the marble purchased by the garnishee, *held* that the evidence was insufficient to prove that interpleader's testator was the owner of the marble; that he was merely an assignee of certain accounts of defendant, and that the evidence did not show with sufficient definiteness that the accounts in question belonged to intestate or that he had a bona fide claim thereto

at the time the attachment process was served on the garnishee.

2. WITNESS—*what adverse party entitled to testify to when deposition of deceased party read in evidence.* Where the deposition of a deceased party is read in evidence, the adverse party is, under the fifth exception in section 2 of the Evidence Act (Cahill's Ill. St. ch. 51, ¶ 2, subd. 5), not limited to a mere denial of the statements made in the deposition but is entitled to fully testify as to the facts and circumstances of the transaction, so far as his knowledge extends, and thereby endeavor to rebut said statements.

3. EVIDENCE—*when telegram sufficiently authenticated.* A telegram introduced in evidence was sufficiently authenticated where the original paper as received from the telegraph office was produced under subpœna, and on its face it appeared to be a reply to another telegram sent on the previous day which the other party introduced in evidence, especially where its genuineness was not questioned at the time it was offered in evidence.

Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. . Heard in the Branch Appellate Court at the March term, 1921. Affirmed. Opinion filed February 14, 1922. Rehearing denied February 25, 1922.

**Statement by the Court.** In this case the contest is between the plaintiff in attachment proceedings and the executor of the last will of an intervening claimant to ascertain funds in the hands of the garnishee, to which funds said claimant during his lifetime claimed he was entitled. It was admitted that the plaintiff was a creditor of the defendant to more than the amount of the funds attached. On the issues made by said claimant's interpleas and plaintiff's replications thereto, the jury returned a verdict against the interpleader and on October 30, 1920, judgment was entered upon the verdict and this appeal followed.

On March 16, 1918, George P. Eastman, a resident of Rutland, Vermont, commenced the attachment suit in the superior court of Cook county against the United Marble Companies, a corporation. In his affidavit he alleged that it is indebted to him in the sum of $4,901.08, upon three drafts dated March 12, 1917, for $1,550 each, together with interest; that it is not a resident of Illinois and that its place of residence

is at Rutland, Vermont. The attachment writ was served on March 16, 1918, on the Daprato Statuary Company, a corporation having its principal office at Chicago, as garnishee. To plaintiff's declaration the United Marble Companies filed a plea of the general issue. On June 11, 1918, the garnishee filed its answer alleging that at the time of the service of the writ it was indebted to the United Marble Companies to the extent of $2,374.92; that subsequently, on April 17, 1918, it received notice from said defendant of an assignment of said indebtedness by the latter to one John A. Mead, of Rutland, Vermont. No further proceedings seem to have been had in the case for about 10 months.

On April 7, 1919, the said Mead filed three interpleas verified by him. In the first interplea he alleges that "the goods and chattels, in respect of which the garnishee * * * alleges that it is indebted to the defendant, United Marble Companies, in the amount of $2,374.92, were, at the time of the sale and delivery thereof to the said garnishee, *the property of the said John A. Mead,* and that the said goods and chattels were then and there so sold by the defendant *as the agent of the said John A. Mead,* and on his behalf," and that by virtue of said sale the said sum is now owing by the garnishee to him, and has been for a long time prior to March 9, 1918. The second interplea is substantially the same as the first, with the additional allegation that notice of the facts that the goods and chattels were the property of Mead and that said debt was owing to him was given by him, "*through his agent, the said defendant,* to the said garnishee and to the plaintiff, George P. Eastman, prior to March 16, 1918." The third interplea is substantially the same as the second, except that said notice was given in the same manner "prior to May 1, 1918." In plaintiff's replication to the first interplea he denies that said goods and chattels at the

time of their sale and delivery to the garnishee were the property of Mead, denies that at said time they were so sold by the defendant as the agent of Mead, denies that the said debt of $2,374.92 is or ever was owing to Mead, and alleges that the same is and was one due from the garnishee to the defendant. In the replications to the second and third interpleas the same denials are made and the respective allegations of Mead as to the giving of the notices are denied.

On April 8, 1919, a stipulation was signed by the attorneys of all parties providing for the taking of Mead's deposition upon oral interrogations at Rutland, Vermont, on May 15, 1919, before a notary public. After many extensions the deposition was finally taken on December 31, 1919, in the absence of plaintiff's attorney, and was returned, duly certified, to the clerk of the superior court, and on January 12, 1920, was opened by the clerk and filed in the cause. On the same day Mead died and on March 8, 1920, by order of court, the executor of his last will and testament, Carl B. Hinsman, was substituted as the party interpleading. Prior to the trial no motion was made by plaintiff to suppress the deposition or any part thereof. The cause was called for trial on October 20, 1920. Before the jury were impaneled, plaintiff's attorney moved to suppress the deposition on the ground that it was taken on a day subsequent to that agreed to by plaintiff and at a time when neither plaintiff nor his attorney were present. The court denied the motion. No cross errors are here assigned by plaintiff on said ruling.

After the jury were sworn the attorney for the intervening claimant stated that, as the sole issues to be determined by the jury were those between said claimant and plaintiff, the former had the right of opening and closing the examination. To this plaintiff's attorney assented, and thereupon claimant's attorney introduced a document, showing the appoint-

ment on February 7, 1920, by the probate court of Rutland district, Vermont, of said Hinsman as said executor, and also offered Mead's deposition in evidence. Mead testified, in substance, that he is president of the Howe Scale Company, and of the Baxter National Bank of Rutland, Vermont; that in 1917, he advanced to P. R. Eaton, president of the United Marble Companies, money or credit, on three notes signed by the marble company, which notes were to be secured on marble which it was shipping to the Daprato Statuary Company; that one note was for $2,750, dated September 22, 1917, due October 2, 1917, payable to the order of John A. Mead, another for $1,200, and a third for $800 subsequently dated, making a total sum of $4,750, together with accrued interest, no part of which sum has ever been repaid to him; that the amount of the first note he advanced in cash, and as to the two other notes he indorsed them, thereby loaning his credit, and the same were discounted by the marble company at the Rutland County Bank and were renewed from time to time and are still outstanding; that as security for said advances and credit loaned he received from the marble company from time to time assignments of certain accounts due it from the statuary company, and certain bills of lading; and that as Eaton frequently went to Chicago he requested Eaton to advise the statuary company of the facts regarding the assignment of said accounts. Mead in his deposition identified certain papers and documents which were attached thereto as exhibits. These were read in evidence before the jury and are as follows: (1) The Marble Company's note to Mead for $2,750; (2) a written order of the same date of the marble company on the statuary company to pay to Mead's order said amount, "$1,500 a/c St. Paul job and $1,200 a/c Indianapolis job"; (3) bill of lading, dated October 11, 1917, of certain marble shipped in car No. 66700 by the marble

company from Rutland and consigned to the statuary company at St. Paul, but which bill of lading does not show on its face to have been assigned to Mead; (4) written assignment to Mead, dated October 13, 1917, of the account due the marble company from the statuary company, $1,857, for said shipment in said car as security for the $800 debt above mentioned; (5) bill of lading, dated January 16, 1918, in the name of John A. Mead as shipper, of 31 boxes of marble, in car No. 42208, shipped from Rutland and consigned to Mead at St. Paul; (6) bill of sale, signed by the marble company by its president, Eaton, dated December 20, 1917, purporting to transfer to Mead the marble shipped in said car No. 42208; and (7) three written assignments by the marble company to Mead, each dated January 19, 1918, of three accounts against the statuary company, $387.71, $841.42, and $333.46, respectively, the first two for marble shipped in said car No. 42208, and the third for marble shipped in car No. 25506.

The intervening claimant also called as a witness Henry B. Schwarte, superintendent of the statuary company, garnishee. He identified certain letters and telegrams which were offered in evidence by said claimant. It appears therefrom that on the same day (January 22, 1918) that the statuary company received *from the marble company* the said bill of lading in the name of Mead as shipper (dated January 16, 1918), it immediately wired the marble company, "We await border patterns Indianapolis sanctuary. *Who is John A. Mead* and how is he connected with last shipments. Answer"; that the statuary company also wrote the marble company: "We have your letter of the 16th inst. inclosing bill of lading for car No. 42208, * * *. This shipment we note is consigned to John A. Mead. While we can surmise the cause of your action in billing this shipment in this manner, it seems that you might have mentioned

the amount of his claim when writing us; as the matter now stands we cannot make a remittance of 85% of your invoice value as you request. We wired you this morning (telegram repeated). Up to the present writing we have not received your reply and will await this before making any remittance." It further appears that on April 18, 1918 (more than one month after the statuary company had been served as garnishee in the present action), the marble company, by Eaton, its president, wrote the statuary company that, confirming telegram of April 16, "We hereby notify you that *assignments of our account against you* were given to John A. Mead * * * on September 22, 1917, and October 11, 1917, and that on December 20, 1917, we gave him bill of sale covering marble shipped to you in car No. 42208; * * * it was to pay moneys advanced to us by Dr. Mead that these assignments and bills of sale were given to him, as I explained to you while I was at your office on March 11, 12 and 13th."

Said claimant also called as a witness P. R. Eaton, president of the marble company. He testified, in substance, that he first saw the said letter, dated January 22, 1918, written by the statuary company to the marble company, wherein the inquiry was made "Who is John A. Mead," in his office in Rutland on January 25, 1918; that he replied to the question in the letter by coming to Chicago about two weeks later and talking with the president of the statuary company, Mr. Rigali; that he then informed Rigali that Mead had advanced the marble company money from time to time on that company's notes, "taking assignments of accounts as collateral security therefor," and that the marble company had assigned its account against the statuary company to Mead, "as collateral for obligations due to him"; that he further informed Rigali, as regards the shipment of Marble, made on January 16, 1918, in which the bill of lading was in Mead's

name as shipper, that "the shipment *was held up by Mr. Eastman attached for a long time at Rutland,* and that finally it was released and forwarded to him in the name of John A. Mead"; that when he (Eaton) was again in Chicago in March, 1918, and before the present attachment suit was commenced, he called at the office of the statuary company and "collected some money on account of the indebtedness due to the United Marble Companies," that he tried unsuccessfully to collect it all, and that what he did collect he turned over to Mead on his return to Rutland, less certain expenses which Mead permitted him to deduct.

At the close of the claimant's evidence, the plaintiff, Eastman, moved for an instructed verdict in his favor, but the motion was denied.

The plaintiff thereupon testified in his own behalf and called as witness Henry B. Schwarte, who had previously testified as a witness for the claimant. The plaintiff also introduced in evidence certain letters and documents and a telegram. His case proceeded on the theory that the asignments of the accounts to Mead by the marble company were illegal and void because f ctitious and made for the purpose of defrauding plaintiff and other creditors of the marble company.

Plaintiff testified, in substance, that as the operator of a marble quarry near Rutland he had had business dealings with the marble company for 4 or 5 years; that he furnished it marble in bulk which it manufactured; that in the spring of 1917, Eaton, president of the marble company, requested him to furnish marble for certain altars, which marble it had arranged to manufacture and sell to the statuary company; that he had negotiations with Eaton and Schwarte (representing the statuary company), which resulted in a written agreement (introduced in evidence) being executed on June 5, 1917, whereby the statuary company agreed to remit to Eastman at the rate of $4 per cubic

foot for all "Eastman's cream marble," shipped either to St. Paul or Indianapolis, upon its orders, within 5 days after receipt of list of sizes contained in each shipment and bill of lading attached, and whereby the marble company agreed that the amounts so remitted to Eastman might be applied as payments to it on its St. Paul and Indianapolis contracts with the statuary company; that pursuant to this agreement he (Eastman) furnished certain bulk marble and received payments for portions thereof from the statuary company; that on March 16, 1918 (the day the attachment proceedings were commenced), there was owing to him on account of shipments under the agreement more than $2,800; that in November, 1917, the marble company owed him moneys which he had unsuccessfully tried to collect; that in the latter part of that month *he attached a carload of marble at Rutland,* which resulted in the marble company giving him an order on the statuary company which it subsequently paid, and which further resulted in a written agreement (introduced in evidence) being entered into between Eastman and Eaton, dated December 4, 1917, which recited the existence of three unpaid drafts of $1,550 each, dated March 12, 1917, the aggregate amount of which including interest the marble company owed Eastman, and which agreement provided, in substance, that, in consideration of the release of said Rutland attachment, Eaton was to become personally responsible for the payment by the marble company of the amount due on said drafts (also introduced in evidence) and was to execute his ten individual notes, aggregating $4,816.88, payable to Eastman's order, as collateral security to said debt of the marble company to Eastman; that neither the drafts nor the notes have been paid, and that there is now due him (Eastman) thereon the sum of $5,621.84; that in February, 1918, he had a conversation with Eaton, at which the latter stated that both he and

the marble company were without funds and unable to keep their promises; that on March 14, 1918, he at his office in Rutland received a letter (introduced in evidence) from the statuary company, advising him that Eaton was then in Chicago and that the statuary company contemplated making a settlement with the marble company pertaining to the St. Paul and Indianapolis contracts, and requesting him to advise the statuary company whether he had any claim against the marble company for material furnished to complete said contracts; that he immediately went to Chicago, and, after having conversations with Schwarte and other representatives of the statuary company, brought the present attachment proceedings; and that during one of his conversations with Schwarte the latter showed him a certain telegram dated January 23, 1918, which the statuary company had received on January 24, 1918, from the marble company. The original telegram, as received from the telegraph company, was produced in court by Schwarte under a subpœna, and the same was admitted in evidence, over the objection of the attorney for the intervening claimant, as being irrelevant to the issues and not binding upon said claimant. The telegram is as follows:

"Car billed in name of John A. Mead *because Eastman attached* and tried to hold; this only way to get car to you; *Mead no claim on car;* send us 85 per cent of invoice as requested; wire answer." (Signed) "United Marble Co."

At the conclusion of plaintiff's testimony the attorney for the intervening claimant moved to exclude such of that testimony as referred to occurrences prior to the death of Mead (January 12, 1920) on the ground of the executor of Mead's will being a party to the suit and by virtue of the provisions of section 2 of the Evidence Act [Cahill's Ill. St. ch. 51, ¶ 2]. The motion was denied.

In rebuttal, on behalf of the intervening claimant, P. R. Eaton further testified that he did not sign on behalf of the marble company, or himself send, the said telegram of January 23 to the statuary company, but would not say but what another representative of the marble company did sign and send it.

BURTON, KANNALLY & MEGAN, for appellant; CHARLES P. MEGAN, of counsel.

MILLER, GORHAM, WALES & NOXON, for appellee; RAYMOND I. PRUITT, of counsel.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

After a careful examination of the evidence both oral and documentary in the present case, and considering all of the circumstances in evidence, we are unable to say that the jury were not amply justified in returning a verdict in favor of the plaintiff on the issues as made by the claimant's interpleas and plaintiff's replications thereto. The claimant failed to prove the allegations contained in his interpleas that the particular marble, in respect of which the statuary company in its answer as garnishee admitted an indebtedness to the marble company in the sum of $2,374.92, was Mead's property. All that Mead's deposition tended to prove, as we read it, was, that Mead had loaned the marble company on its note in September, 1917, the sum of $2,750; had also loaned his credit to the marble company by subsequently in the same year indorsing its two other notes at a bank aggregating $2,000 (which notes were still outstanding and had not been taken up by him), and, as security for said loan of $2,750 and said loaned credit, had taken assignments of certain accounts to become due from the statuary company to the marble company for certain marble shipped, and yet had, without giv-

ing direct notice himself to the statuary company of said assignments, permitted the marble company to continue its dealings with the statuary company and to collect moneys on said accounts in its own name to all intents and purposes the same as if said assignments had not been made. Furthermore, the claimant's evidence did not show with sufficient definiteness that the particular accounts so assigned to Mead were a part, or what part if any, of the indebtedness of the statuary company to the marble company at the time of the service of the attachment writ in the present proceedings. It appears from the testimony of the witness, Schwarte, that the first notice that the statuary company received that Mead was in any way interested in the dealings then being transacted between it and the marble company, was January 22, 1918, when the statuary company sent its telegram, asking information as to Mead and how he was connected with a recent shipment made in his name, to which telegram the marble company replied by wire, explaining matters and saying, in substance, that Mead had no claim on said shipment. And there is a noticeable conflict in the testimony of Mead and that of Eaton, both witnesses for the claimant. Mead in his deposition, given on December 31, 1919, testified that up to that time no part of the alleged indebtedness of the marble company to him had been paid. In other words, he testified in effect that up to that time he had not realized anything on the accounts alleged to have been assigned to him as security for said indebtedness. Eaton, on the contrary, testified that when he was in Chicago in March, 1918, before plaintiff commenced the present attachment suit, he (Eaton) collected some money from the statuary company, on account of its indebtedness to the marble company, tried unsuccessfully to collect it all, and that on his return to Rutland he turned over to Mead what he did collect, less certain expenses deducted. In our

opinion it does not sufficiently appear from all the facts and circumstances in evidence that at the time of the service of the writ on the statuary company (March 16, 1918) the intervening claimant had, as against the attaching creditor, Eastman, a bona fide claim to the funds or any part thereof then in the hands of the statuary company and owing to the marble company.

It is earnestly contended by counsel for the intervening claimant that, because of the provisions of section 2 of the Evidence Act [Cahill's Ill. St. ch. 51, ¶ 2], Eastman was an incompetent witness, and that the trial court erred in not granting the motion of said claimant, made at the close of Eastman's testimony to exclude such of that testimony as referred to occurrences prior to the death of Mead on January 12, 1920. It is provided in section 1 of said Act [Cahill's Ill. St. ch. 51, ¶ 1]: "That no person shall be disqualified as a witness in any civil action, suit or proceeding, except as hereinafter stated, by reason of his or her interest in the event thereof, as a party or otherwise, * * *; but such interest * * * may be shown for the purpose of affecting the credibility of such witness; * * *." And it is provided in section 2 of said Act [Cahill's Ill. St. ch. 51, ¶ 2] in part as follows:

"No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as * * * the executor, administrator, heir, legatee or devisee of any deceased person, * * * unless when called as a witness by such adverse party so suing or defending, and also except in the following cases, namely:

"*First.* In any such action, suit or proceeding, a party or interested person may testify to facts occurring after the death of such deceased person, * * *.

"*Fifth.* When, in any such action, suit or proceeding, the deposition of such deceased person shall be read in evidence at the trial, any adverse party or party in interest may testify as to all matters and things testified to in such deposition by such deceased person, and not excluded for irrelevancy or incompetency."

After considering the testimony of Mead, as read in evidence before the jury from his said deposition, we are of the opinion that, under the provisions of the fifth exception in said section 2 of said Act [Cahill's Ill. St. ch. 51, ¶ 2, subd. 5], Eastman was a competent witness to testify to the facts which he did testify to, and that the trial court did not err in refusing to grant the motion of the claimant above mentioned. By said statute Eastman could testify in his own behalf "as to all matters and things" testified to by Mead in his deposition and not excluded from the jury. We do not think that Eastman was limited to a mere denial of Mead's statements but was entitled to fully testify as to the facts and circumstances of the transactions so far as his knowledge extended, and thereby endeavor to rebut said statements. (See *Turner v. Lee,* 254 Ill. 141, 145; *DeCosta v. Bischer,* 287 Ill. 598, 604.)

Counsel for the claimant further urge that the trial court erred in admitting in evidence over objection the telegram of January 23, 1918, received by the statuary company and signed "United Marble Co.," wherein it is stated "car billed in name John A. Mead because Eastman attached and tried to hold; this only way to get car to you; Mead no claim on car," etc. It is contended that it was inadmissible (1) because it was not satisfactorily authenticated, and (2) because it was at most a declaration by an assignor subsequent to the assignment and therefore not binding on the assignee in the absence of evidence connecting the latter with the declaration. As to counsel's first con-

tention, we think that the telegram was sufficiently authenticated. The original paper as received from the telegraph office by the statuary company was produced under a subpœna. On its face it clearly appears to be a reply to another telegram sent on the preceding day by the statuary company to the marble company, and which other telegram the claimant introduced in evidence. Under the circumstances further authentication was unnecessary. (*Western Twine Co. v. Wright,* 11 S. Dak. 521; *Morgan v. People,* 59 Ill. 58, 62.) Moreover, at the time the telegram was offered in evidence, the claimant did not question its genuineness. The only objections he then made to its introduction in evidence were that it was irrelevant to the issues and not binding upon him. As to counsel's second contention, the general rule referred to is subject to some exceptions. (2 Wigmore on Evidence, par. 1086, p. 1298.) And, under the facts and circumstances disclosed, we think that the telegram was admissible as a declaration of Mead's admitted agent, the marble company, whom he permitted to retain possession of and exercise full control over the property and accounts the same as if the assignments had never been made, and whom he intrusted to collect the accounts for him in its own name. (*Jones v. King,* 86 Ill. 225, 228; 41 L. R. A., N. S., page 26, note C; 22 Corpus Juris, p. 366, sec. 438.)

Our conclusion is that the judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*

BARNES and MORRILL, JJ., concur.